**MYTEL INTERNATIONAL, INC., Appellant,**

v.

**TURBO REFRIGERATING COMPANY, Appellee.**

No. 2–84–113–CV.

Court of Appeals of Texas, Fort Worth.

May 2, 1985.

Phillips, White, Davidge, Griffin, Shelton, Eames, Wood & Duncan and David C. White, Denton, for appellant.

Whitten & Loveless, P.C. and Michael J. Whitten, Denton, for appellee.

Before BURDOCK and HILL, JJ.

## OPINION

HILL, Justice.

Mytel International, Inc. sued Turbo Refrigerating Company for breach of an agreement to purchase office supplies. Turbo brought a counterclaim asserting fraud and violations of the Texas Deceptive Trade Practices Act. Mytel appeals from a judgment which awarded it nothing on its claim and which awarded $8,368.38 plus

attorney's fees to Turbo on its counter-claim.

Mytel presents eight points of error. Turbo has brought forward one cross-point of error.

We reverse, because we find that there was no evidence to support the jury's finding as to the fair and reasonable market value of certain goods shipped from Mytel to Turbo. We remand for a trial on Turbo's counterclaim, because we find that the interests of justice require another trial.

This case began in September 1978, when Rhonda Burnside, an employee in Turbo's purchasing department, began ordering large numbers of office supplies from Mytel and other office supply companies. Turbo had only about 20 employees with clerical responsibilities, yet Burnside in less than a year placed four orders with Mytel totaling $11,634.64 for 5,352 markers, 1,728 pens, 864 rolls of tape, 1,750 file folders, 864 yellow pads and 144 boxes of 1,000 paper clips. Burnside testified that she received kickbacks of cash, a television, and a microwave oven from Mytel.

Although Burnside placed the orders with salesman Ralph Roades, the orders were not filled until Mytel confirmed the order directly. In order to contact Roades, Burnside called Mytel. All complaints about the products or service had to be made directly to Mytel. Mytel had to give prior approval before any merchandise could be returned. Invoices were sent directly from Mytel's headquarters, and payment was made to "Mytel International". Turbo's checks were returned with the endorsement, "Mytel International, Inc."

In August 1979, while Burnside was on vacation, her superior at Turbo, purchasing agent Ben Davis, noticed the arrival of a large shipment of office supplies. Davis called Mytel and told them not to do any more business with Turbo.

On September 7, 1979, Roades induced Burnside to place one more order with Mytel for office supplies totaling $14,231.52. Turbo refused to accept the shipment when it arrived. Turbo received Mytel's invoice for the shipment on September 24th. At that point, Turbo's president, William Hagen, began to investigate the situation. Burnside eventually pleaded guilty to theft.

Mytel, alleging that Turbo had breached the September 7th contract to purchase office supplies, sued Turbo on February 11, 1981. Turbo replied on March 5, 1981, but did not add its Texas Deceptive Trade Practices counterclaim until September 23, 1983. The counterclaim alleged that Mytel had engaged in an unconscionable course of conduct by overcharging Turbo on the four purchase orders placed before September 7, 1979.

At trial, the jury found that Roades acted as Mytel's agent when he solicited the September 7, 1979 order, that Mytel had engaged in an unconscionable action or course of action both prior to September 7, 1979, and again on that date, that the fair and reasonable market value of the first four orders was $5,266.26, and that Turbo's actual damages were $6,368.38. The trial court rendered judgment against Mytel on its breach of contract suit, and for Turbo on its Deceptive Trade Practices Act claim. The court set Turbo's actual damages at $6,368.38, but doubled only the first $1,000 portion of those actual damages in awarding Turbo $8,368.38 plus attorney's fees and costs of court.

By point of error number one, Mytel asserts that Turbo's counterclaim under the Deceptive Trade Practices Act was barred by the Statute of Limitations. In this case, the Statute of Limitations is four years, under the 1977 version of the Deceptive Trade Practices Act in effect when the unconscionable course of conduct began in 1978. *See La Sara Grain v. First Nat. Bank of Mercedes,* 673 S.W.2d 558, 565 (Tex.1984); *Woods v. Littleton,* 554 S.W.2d 662, 666 (Tex.1977).

 A Statute of Limitations begins to run at such time as fraud is discovered or, by the exercise of reasonable diligence, might have been discovered. *Courseview, Incorporated v. Phillips Petroleum Co.,* 312 S.W.2d 197, 205 (Tex.1957); *Jim Walter Homes, Inc. v. Castillo,* 616 S.W.2d

630, 633 (Tex.Civ.App.—Corpus Christi 1981, no writ); *Kelly v. Dorsett*, 581 S.W.2d 512, 513 (Tex.Civ.App.—Dallas 1979, writ ref'd n.r.e.). When the issue of limitation is raised by the pleadings, and evidence on the issue has been introduced, the question of whether the cause of action is barred is ordinarily one of fact for the jury. *Tenneco Oil Company v. Rollans*, 399 S.W.2d 217, 220 (Tex.Civ.App.—Amarillo 1965, no writ).

■ Here, there was evidence from Davis, the purchasing agent, that he became suspicious in August 1979. There was also evidence that the arrival of the $14,231.52 invoice from Mytel on September 24, 1979 was what sparked the investigation that led to Burnside's confessions to the police. The jury could have found that the discovery took place in August 1979, or it could have found that the discovery took place on or after September 24, 1979. The jury, however, was not asked to determine this fact question. Where the Statute of Limitations is pleaded but no request is made to have the issue submitted to the jury, and no objection is made to the court's charge for failure to include such an issue, the Statute of Limitations defense is waived. *McMullan v. Friend*, 642 S.W.2d 15, 18 (Tex.App.—El Paso 1982, no writ); *Burba v. Lary*, 296 S.W.2d 797, 804 (Tex.Civ.App.—Waco 1956, writ ref'd n.r.e.). Mytel pleaded the Statute of Limitations but did not request a Statute of Limitations issue and did not object to the court's failure to include such an issue in the jury charge. Mytel has therefore waived the issue. We overrule point of error number one.

■ By points of error numbers four and five, Mytel urges that there is no evidence or insufficient evidence to support the jury finding that Ralph Roades acted with actual or apparent authority from Mytel International.

The sole jury question on agency was Special Issue No. 4, in which the jury was asked if Roades "acted with actual or apparent authority from MYTEL INTERNATIONAL in soliciting the purchase order of September 7, 1979." The jury answered, "We do." The jury was not asked if Roades acted as Mytel's agent in soliciting the first four purchase orders, all dated before September 7, 1979, which form the basis for Turbo's recovery under the Deceptive Trade Practices Act. However, such a finding of agency is not essential to Turbo's cause of action.

Section 17.45(4) of the 1977 Deceptive Trade Practices Act defines a consumer as one " 'who seeks or acquires by purchase or lease, any goods or services.' " *Flenniken v. Longview Bank and Trust Co.*, 661 S.W.2d 705, 706 (Tex.1983). Here, Turbo was sent office supplies directly from Mytel, was billed directly by Mytel, and sent payments directly to Mytel. A consumer can bring a suit under sec. 17.-50(a)(3) if it " 'has been adversely affected by ... any unconscionable action or course of action by *any person*.' " *Flenniken*, 661 S.W.2d at 706. Unconscionability can be defined as " 'an act or practice which, to a person's detriment: ... results in a gross disparity between the value received and consideration paid, in a transaction involving transfer of consideration.' " *Franks v. Associated Air Center, Inc.*, 663 F.2d 583, 592 (5th Cir.1981). Mytel's conduct was unconscionable, not because Roades bribed Burnside, but because the jury found that Mytel greatly overcharged Turbo. *See Miller v. Soliz*, 648 S.W.2d 734, 739 (Tex.Civ.App.—Corpus Christi 1983, no writ). Privity of contract is not a requirement. *Stagner v. Friendswood Development Co., Inc.*, 620 S.W.2d 103, 103 (Tex.1981); *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 541 (Tex.1981). From Turbo's point of view, there was only one transaction, the purchase of office supplies, and Mytel could be sued as one who sought to enjoy the benefits of that transaction. *See Flenniken*, 661 S.W.2d at 707; *Knight v. Intern. Harvester Credit Corp.*, 627 S.W.2d 382, 389 (Tex.1982).

Since we hold that Turbo did not have to show that Roades acted as Mytel's agent, we overrule points of error numbers four and five.

In point of error number six, Mytel asserts that there is no evidence to support the jury's finding as to the fair and reasonable market value of the goods shipped to Turbo pursuant to purchase orders issued before September 7, 1979.

■ In determining a "no evidence" point, we are to consider only the evidence and inferences which tend to support the finding of the jury and disregard all evidence and inferences to the contrary. *See International Armament Corporation v. King*, 686 S.W.2d 595 (Tex.1985); *Stodghill v. Texas Employers Insurance Association*, 582 S.W.2d 102, 103 (Tex.1979); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951). If there is any evidence of probative force to support the finding of the jury, the point must be overruled and the finding upheld. *In re King's Estate*, 244 S.W.2d at 661–62.

■ A "no evidence" point of error must and may only be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; (4) the evidence establishes conclusively the opposite of a vital fact. *Royal Indemnity Co. v. Little Joe's Catfish Inn, Inc.*, 636 S.W.2d 530, 531 (Tex.App.—San Antonio 1982, no writ); Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Texas L.Rev. 361 (1960).

■ If a "no evidence" point is sustained and the proper procedural steps have been taken, the finding under attack may be disregarded entirely and judgment rendered for the appellant unless the interests of justice require another trial. *See National Life & Accident Ins. Co. v. Blagg*, 438 S.W.2d 905, 909 (Tex.1969); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965).

■ The jury found from the invoices and cancelled checks that Turbo paid Mytel $11,634.64 for the first four orders of office supplies. The jury determined that $2,326.93 (20% of $11,634.64) was the wholesale cost to Mytel. The jury added a 100% profit and the actual freight and handling charges as shown on the invoices to arrive at a market value of $5,266.26.

Evidence as to Mytel's wholesale costs and "service fees" was introduced at trial in the form of testimony by Mytel's president, Gil Michaels, about two of the purchase orders. On one, for $3,918.91, the wholesale cost was $951.08 (24%) and the service fee was $783.63 (20%). On the other, for $4,872.96, the wholesale cost was $1,084.00 (22%) and the service fee was $1,071.84 (22%). There was no testimony as to the wholesale cost or service fee on the other two invoices in question. There was no testimony as to a fair and reasonable retail price for the goods or as to the reasonable market value of the goods if purchased in bulk.

We find that there was no evidence introduced at trial from which the jury could calculate the fair and reasonable market value of the office supplies Turbo received. In view of our holding herein, we need not consider Mytel's points of error two, three, seven, and eight.

■ Turbo has presented one cross-point to us on appeal. Turbo asks us to find that the trial court erred in refusing to render judgment for Turbo for treble damages. As noted above, since the course of conduct for which Turbo was awarded actual damages began before the effective date of the 1979 Deceptive Trade Practices Act amendments on August 27, 1979, the 1977 version of the Deceptive Trade Practices Act applies to this case. *See La Sara Grain*, 673 S.W.2d at 565; *Lubbock Mortg. & Inv. Co., Inc. v. Thomas*, 626 S.W.2d 611, 613 (Tex. App.—El Paso 1981, no writ). Under the 1977 Deceptive Trade Practices Act, treble damages are mandatory. *Pennington v. Singleton*, 606 S.W.2d 682, 691 (Tex.1980); *Woods*, 554 S.W.2d at 671. We sustain Turbo's cross-point.

■ In view of the flagrant nature of the conduct found by the jury in this cause,

we find that the interest of justice requires another trial on Turbo's counterclaim.

We reverse and remand for trial on Turbo's counterclaim with one-half costs of court charged to the appellant and one-half costs charged to the appellee.